# Statute Limiting the President's Authority to Supervise the Director of the Centers for Disease Control in the Distribution of an AIDS Pamphlet

Statutory provision requiring the Director of the Centers for Disease Control to distribute an AIDS information pamphlet to the public "without necessary clearance of the content by any official, organization or office" violates the separation of powers by unconstitutionally infringing upon the President's authority to supervise the executive branch.

March 11, 1988

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

This memorandum responds to your request that this Office comment on the constitutionality of a provision found in H.J. Res. 395 (the fiscal 1988 Continuing Resolution), which purports to require the Director of the Centers for Disease Control ("CDC") to arrange for the mass mailing of AIDS information fliers, free from any executive branch supervision. For the reasons set forth below, we believe that this provision violates the separation of powers by unconstitutionally infringing upon the President's authority to supervise the executive branch.[1]

## I. Background

The provision in question is found at page 22 of the "Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriation Act," one of the appropriations measures subsumed within H.J. Res. 395. That provision requires "[t]hat the Director [of the CDC] *shall cause to be distributed without necessary clearance of the content by any official, organization or office*, an AIDS mailer to every American household by June 30, 1988, as approved and funded by the Congress in Public Law 100–71" (emphasis added).[2]

---

[1] This memorandum is confined to the constitutional illegitimacy of this provision's restriction on the President's exercise of his supervisory powers. Accordingly, this memorandum does not address the constitutionality of the provision's establishment of a June 30, 1988, deadline for the mailing of AIDS fliers. *See* text of provision, *infra*, main text.

[2] The provision's legislative history suggests that congressional concern over White House delays in authorizing the mailing of AIDS fliers by the CDC led to passage of the provision under scrutiny in this memorandum. The Senate Appropriations Committee Report accompanying the fiscal 1988 Departments of Labor, Health and Human Services, and Education and Related Agencies Appropriations Bill stated: "The Committee is greatly concerned that the $20,000,000 provided by the Committee in the 1987 supplemental for an every-household mailing has been delayed by the White House The Committee believes that this is an important initiative as recommended by the

The CDC is a subordinate executive branch agency within the Public Health Service of the Department of Health and Human Services ("HHS").[3] On its face, the language highlighted above ("*shall* cause to be distributed *without* . . . clearance of the content by *any* official") appears to preclude the President and his subordinates from overseeing the CDC's determination of the content of the AIDS mailer. This language thus prevents the President, either directly or through his subordinates, from supervising a subordinate executive branch official (the CDC Director) in the conduct of certain of his duties (*viz.*, the dissemination of specified AIDS-related information to the public), trenching upon the President's exclusive constitutional authority to supervise the executive branch. *See* U.S. Const. art. II, § 1, cl. 1 ("The executive Power shall be vested in a President of the United States of America.").[4]

## II. Discussion

### A. *The Nature of the Unitary Executive*

As head of a unitary executive, the President controls all subordinate officers within the executive branch. The Constitution vests in the President of the United States "The executive Power," which means the *whole* executive power. Because no one individual could personally carry out all executive functions, the President delegates many of these functions to his subordinates in the executive branch. But because the Constitution vests this power in him alone, it follows that he is solely responsible for supervising and directing the activities of his subordinates in carrying out executive functions. Any attempt by Congress to constrain the President's authority to supervise and direct his subordinates in this respect, violates the Constitution.

---

[2] (. . continued)
CDC and the Department [of Health and Human Services], and bill language has been included mandating this mailing by February 15, 1988." S. Rep No 189, 100th Cong., 1st Sess. 70 (1987). (The mailing deadline date was changed to June 30, 1988, in the final Continuing Resolution.) Reflecting this concern, the amended version of the Labor and Related Agencies Appropriations Bill, reported by the Appropriations Committee and debated by the full Senate on October 13, 1987, contained language requiring CDC to distribute AIDS mailers "without necessary clearance of the content by any official, organization or office." *See* 133 Cong Rec. 27,372 (1987).

[3] The CDC was established by the Secretary of HHS pursuant to his authority under section 301 of the Act of July 1, 1944, as amended, 58 Stat. 691 (1944) (codified at 42 U.S.C § 241). That section authorizes the Secretary of HHS to "conduct in the [Public Health] Service . . . research, investigations, experiments, demonstrations, and studies relating to the causes, diagnosis, treatment, control, and prevention of physical and mental diseases and impairments of man." 42 U.S.C § 241(a). The CDC was organized as the "Communicable Disease Center" in the 1950s, and redesignated the CDC in 1970. *See* 35 Fed. Reg 10,797 (1970). The CDC was given full "agency status" in 1973. *See* 38 Fed. Reg. 18,261 (1973). The CDC was reorganized in 1980. *See* 45 Fed. Reg. 67,772 (1980).

[4] Since the provision in question, on its face, precludes supervision of the CDC Director "by any official, organization or office," the question arises whether the President himself is an "official, organization or office" within the meaning of the statute. Even assuming that the President himself is deemed to be neither an "official" (a strained interpretation, since the President certainly exercises "official" functions in carrying out his duties, such as the duty to "take Care that the Laws be faithfully executed") nor an "organization" nor an "office," the provision at issue is constitutionally impermissible, in that it effectively eviscerates the President's ability to supervise a subordinate executive branch agency, the CDC. Since even under this construction the terms "official," "organization," and "of-

48

## B. Evidence of Original Intent

Evidence of the framers' original intent demonstrates that the Constitution was designed to vest the whole executive power in the President.[5] The framers purposefully chose a unitary executive approach over a more traditional alternative. Influenced by the British model, in which ministers were held responsible for the acts of an unimpeachable monarch, most of the original states inhibited their governors' power by forcing them to act through, or in cooperation with, some form of privy council or constitutional cabinet. *See* The Federalist No. 70 (Alexander Hamilton) (Clinton Rossiter ed., 1961) ("The Federalist"). This device was carefully considered and deliberately rejected by the Federal Convention. The question of the proper disposition of the executive power in the new Constitution provoked a lengthy explication in several numbers of thè The Federalist.

The two main reasons for adopting a truly unitary executive in the new Constitution were complementary and mutually reinforcing. On the one hand, unity obviously promotes dispatch and decisiveness, which is of far greater importance in the executive than in either of the other branches. As Hamilton pointed out:

> In the legislature, promptitude of decision is oftener an evil than a benefit. The differences of opinion, and the jarring of parties in that department of the government, though they may sometimes obstruct salutary plans, yet often promote deliberation and circumspection, and serve to check excesses in the majority. . . . But no favorable circumstances palliate or atone for the disadvantages of dissention in the executive department. . . . They serve to embarrass and weaken the execution of the plan or measure to which they relate, from the first step to the final conclusion of it.

---

[4] (. . . continued)

fice" certainly encompass all officers of the executive branch other than the President, the President would be precluded from assigning supervision of the CDC's AIDS mailer activities to *any* of his subordinates Wholly apart from the fact that limitations on the President's time would prevent him personally from overseeing the CDC's AIDS-related functions, such a preclusion would intolerably denude the President of his constitutional prerogative to establish the means by which his supervisory authority is to be exercised As this Office has opined, the mere fact that Congress places particular executive functions in specified executive branch agencies does not preclude the President from exercising general supervisory authority with regard to those functions through his agents, such as the Office of Management and Budget *See Proposed Executive Order Entitled "Federal Regulation"*, 5 Op O L.C. 59, 63–64 (1981). Yet the statutory provision at issue would bar him from assigning supervision of the CDC's AIDS mailer to any other individual or entity within the executive branch. (For example, even assuming the President himself is not covered by this statute, he could not assign supervision of the CDC's AIDS mailer activities to his subordinates within the White House Office, since the term "office" would appear to apply to that entity. Buttressing this conclusion is the fact that the Senate's concern about "White House delays" (*see supra* note 2) apparently prompted adoption of the statutory provision under scrutiny.) In sum, even if the President is not personally covered, the effective result of this statutory provision would be an infringement on the President's supervisory authority vis-a-vis CDC's AIDS mailer activities.

[5] Our discussion of the Framers' original intent with respect to the unitary executive does not purport to be exhaustive, but illustrative. For a fuller discussion of the issue, *see Myers v United States*, 272 U.S. 52 (1926).

The Federalist No. 70, at 426–27 (Alexander Hamilton). Even more important in Hamilton's view, however, unity in the executive promotes accountability, which is the necessary flip side of decisiveness. As Hamilton pointed out, the more that the executive power is watered down and distributed among various persons, the easier it is for everyone concerned to avoid the blame for bad actions taken or for desirable actions left undone.

At the Pennsylvania ratifying convention, James Wilson offered the same view of the advantages of a unitary executive:

> The next good quality that I remark is, that the *executive authority is one.* . . . The executive power is better to be trusted when it has no screen. . . . We secure *vigor.* We well know what numerous executives are. We know there is neither vigor, decision, nor responsibility, in them. Add to all this, that officer is placed high, and is possessed of power far from being contemptible, yet not a *single privilege* is annexed to his character; far from being above the laws, he is amenable to them in his private character as a citizen, and in his public character by *impeachment.*

2 Elliot's Debates 480.

The Framers were under no illusions that vesting the executive power in a single person would suffice to accomplish the goals they had in mind when they chose a unitary executive. They believed that the nature of popular government is such that legislative tyranny is the danger most to be feared: as Madison noted, legislatures inevitably seek to draw "all power into [their] impetuous vortex." The Federalist No. 48, at 309 (James Madison). Alexander Hamilton explained this tendency as follows: "The representatives of the people, in a popular assembly, seem sometimes to fancy that they are the people themselves, and betray strong symptoms of impatience and disgust at the least sign of opposition from any other quarter; as if the exercise of its rights, by either the executive or judiciary, were a breach of their privilege and an outrage to their dignity." The Federalist No. 71, at 433.

The constitutional remedies for what Madison called "this inconveniency" (The Federalist No. 51, at 322) (James Madison) included the devices of bicameralism and the presidential veto. But human nature being what it is, the framers anticipated that the legislature would inevitably seek and find new devices for encroaching on the other branches and for trying to make those other branches its servants. The only way to prevent this from happening was to arm the President and encourage him to fight against it:

> [T]he great security against a gradual concentration of the several powers in the same department consists in giving to those who administer each department the necessary constitutional means

` and personal motives to *resist* encroachments of the others. . . .
Ambition must be made to counteract ambition.

The Federalist No. 51, at 321–322 (James Madison) (emphasis added). *See also INS v. Chadha*, 462 U.S. 919, 951 (1983) ("The hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power, even to accomplish desirable objectives, must be resisted.").

The fundamental need for the President to have firm control over the conduct of his executive branch subordinates was recognized by the First Congress when it debated whether he had the inherent power to remove those subordinates from office. In the course of an extended debate in the House of Representatives, numerous Congressmen articulated the reasons for leaving the President the means of remaining master in his own house. *See* 1 Annals of Cong. 462–584 (1789). For example, James Madison said:

> Vest [the power of removal] in the Senate jointly with the President, and you abolish at once that great principle of *unity and responsibility* in the Executive department . . . . If the President should possess alone the power of removal from office, those who are employed in the execution of the law will be in their proper situation, and the chain of dependence be preserved . . . . The powers relative to offices are partly Legislative and partly Executive. The Legislature creates the office, defines the powers, limits its duration, and annexes a compensation. *This done, the Legislative power ceases.*

*Id.* at 499, 581–82 (emphasis added). Mr. Boudinot of New Jersey described what would happen if the President could not unilaterally dismiss his subordinates:

> [W]hat a situation is the President then in, surrounded by officers with whom, by his situation, he is compelled to act, but in whom he can have no confidence, *reversing the privilege given him by the Constitution*, to prevent his having officers imposed upon him who do not meet his approbation?

*Id.* at 469 (emphasis added). Mr. Sedgwick of Massachusetts said:

> Shall a man . . . be saddled upon the President, who has been appointed for no other purpose but to aid the President in performing certain duties? . . . If he is, where is the responsibility? Are you to look for it in the President, who has no control over the of-

51

ficer, no power to remove him if he acts unfeelingly or unfaith-
fully?[6]

*Id.* at 522–23.

In short, the Framers believed that the President should enjoy exclusive au-
thority to supervise his subordinates in carrying out executive functions, free from
interference by the other branches.

## C. *Case Law Precedents*

Supreme Court jurisprudence supports the proposition that the President should
enjoy full power to supervise his subordinates in carrying out executive branch
functions. For example, in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 165–66
(1803), Chief Justice Marshall stated:

> By the Constitution of the United States, the President is in-
> vested with certain important political powers, in the exercise of
> which he is to use his own discretion, and is accountable only to
> his country in his political character, and to his own conscience.
> To aid him in the performance of these duties, he is authorized to
> appoint certain officers, who act by his authority and in confor-
> mity with his orders.

> In such cases, their acts are his acts; and whatever opinion may
> be entertained of the manner in which executive discretion may
> be used, still there exists, and can exist, no power to control that
> discretion.

The extent of the President's right to control subordinate officers was specif-
ically considered by the Supreme Court in a trilogy of cases involving the Pres-
ident's power to remove federal officials. In *Myers v. United States*, 272 U.S. 52
(1926), the Court ruled unconstitutional a statute that limited the President's
power to remove certain postmasters, and it declared, in dictum, that the repealed

---

[6] Admittedly, this debate was not entirely one-sided. Some Members of Congress argued that the Senate must
consent to the President's removal of particular subordinates. For example, Mr. Jackson of Georgia argued against
allowing officers of the executive departments to be "mere creatures of the President," on the ground that such a
result would cause executive "ministers [to] obtrude upon us to govern and direct the measures of the Legislature,
and to support the influence of their master." *Id* at 487 Mr. White of Virginia maintained that the President's
claimed power to remove executive officers "is a doctrine not to be learned in American Governments; is no part
of the Constitution of the Union." *Id* at 513. Nevertheless, the point of view articulated by Madison—that the Pres-
ident alone possesses the power to remove his subordinates within the executive branch—carried the day. In en-
acting legislation creating executive departments, the First Congress decided *not* to include provisions specifying
the means by which executive officers could be removed from Office.

Tenure of Office Act had been unconstitutional as well.[7] In reaching this conclusion, the Court considered a number of factors, including the constitutional debates, previous congressional practice, and the relationship between the power to appoint and the power to remove. In addition, the Court expressly based its decision on the conclusion that "Article II grants to the President the executive power of the Government, *i.e.*, the general administrative control of those executing the laws, including the power of appointment and removal of executive officers—a conclusion confirmed by his obligation to take care that the laws be faithfully executed." 272 U.S. at 163–64. The Court based this conclusion on the following analysis of the President's control over subordinate officials:

> The ordinary duties of officers prescribed by statute come under the general administrative control of the President by virtue of the general grant to him of the executive power, and he may properly supervise and guide their construction of the statutes under which they act in order to secure that unitary and uniform execution of the laws which Article II of the Constitution evidently contemplated in vesting general executive power in the President alone. Laws are often passed with specific provision for the adoption of regulations by a department or bureau head to make the law workable and effective. The ability and judgment manifested by the official thus empowered, as well as his energy and stimulation of his subordinates, are subjects which the President must consider and supervise in his administrative control. Finding such officers to be negligent and inefficient, the President should have the power to remove them.

*Id.* at 135.

The Court confirmed this view of the President's power over his subordinates within the executive branch in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935). In that case, the Court ruled that Congress could, consistent with the Constitution, immunize a Commissioner of the Federal Trade Commission from removal by the President at his pleasure. The Court reasoned that the FTC could not "be characterized as an arm or an eye of the executive. Its duties are performed without executive leave and, in the contemplation of the statute, must be free from executive control." *Id.* at 628. Specifically, the Court found that "the [C]ommission acts in part quasi-legislatively [in making investigations for the information of Congress] and in part quasi-judicially [in acting as a 'master in chancery'] . . . . To the extent that it exercises any executive function . . . it does

---

[7] The Tenure of Office Act, 14 Stat. 430 (1867), had provided that all officers appointed by and with the consent of the Senate should hold their offices until their successors had been appointed and approved, and that certain heads of departments, including the Secretary of War, should hold their offices during the term of the President who appointed them, subject to removal by consent of the Senate. This Act was the principal basis for the articles of impeachment filed against President Andrew Johnson after he dismissed his Secretary of War without the consent of the Senate.

so in the discharge and effectuation of its quasi-legislative or quasi-judicial powers, or as an agency of the legislative or judicial departments of the government." *Id.* (citation omitted). *Myers* was distinguished on the ground that "[t]he actual decision in the *Myers* case finds support in the theory that such an officer is merely one of the units in the executive department and, hence, inherently subject to the exclusive and illimitable power of removal by the Chief Executive, whose subordinate and aid he is." *Id.* at 627. The Court emphasized that the President retained the right to direct the actions of his subordinates in carrying out executive branch functions, free from interference by another branch:

> The fundamental necessity of maintaining each of the three general departments of government entirely free from the control or coercive influence, direct or indirect, of either of the others, has often been stressed and is hardly open to serious question. So much is implied in the very fact of the separation of the powers of these departments by the Constitution; and in the rule which recognizes their essential co-equality. The sound application of a principle that makes one master in his own house precludes him from imposing his control in the house of another who is master there.

*Id.* at 629–30. Thus, by narrowing *Myers* to cover only subordinates of the President carrying out purely executive functions, the Court linked the removal power even more clearly to the right of the President to control purely executive officials.

This principle was reaffirmed in *Wiener v. United States*, 357 U.S. 349 (1958). In that case, the Court held that the President did not have a constitutional right to remove a member of the War Claims Commission. The Court ruled that the Commission was essentially judicial in nature and that it was intended by Congress to operate entirely free of the President's control. *Id.* at 355–56. The Court expressly linked the right of removal with the right of the President to control a particular official:

> If, as one must take for granted, the War Claims Act precluded the President from influencing the Commission in passing on a particular claim, *a fortiori* must it be inferred that Congress did not wish to have hang over the Commission the Damocles' sword of removal by the President for no reason other than that he preferred to have on that Commission men of his own choosing.

*Id.* at 356. The Court thus emphasized that *Humphrey's Executor* "drew a sharp line of cleavage between officials who were part of the Executive establishment and were thus removable by virtue of the President's constitutional powers," and those who were members of an independent body required to exercise its judgment without hindrance from the Executive. *Id.* at 353. As the Court pointed out, it is the *function* of a governmental body that determines whether it is subject to

54

executive control. The "sharp differentiation [between those officials who are freely removable by virtue of the President's inherent constitutional powers and those who are not] derives from the difference in functions between those who are part of the Executive establishment and those whose tasks require absolute freedom from Executive interference." *Id.*

These three cases clearly establish the President's right to control the actions and duties of his subordinates within the executive branch. *Myers* explicitly set forth the President's right to control as one of the bases for establishing the presidential right to discharge subordinate officials. *Humphrey's Executor* and *Wiener*, while limiting the President's removal power, reinforced the link between the President's right to control and his right to remove executive branch officials. Since, in the instant case, the Director of the CDC performs an executive function and is thus inescapably within the executive branch, the limitations imposed by *Humphrey's Executor* and *Wiener* do not apply to presidential supervision of the CDC Director.

The President's right to control the execution of the laws free from undue interference from coordinate branches of government is supported by an additional line of authority. In *United States v. Nixon*, 418 U.S. 683 (1974), the Supreme Court confirmed that the Constitution protects the integrity of the executive branch decision-making process from interference by another branch through demands for information about the executive's deliberations. The Court recognized

> the valid need for protection of communications between high Government officials and those who advise and assist them in the performance of their manifold duties; the importance of this confidentiality is too plain to require further discussion. Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decision-making process.

*Id.* at 705. The Court specifically acknowledged that this right of confidentiality "can be said to derive from the supremacy of each branch within its own assigned area of constitutional duties. Certain powers and privileges flow from the nature of enumerated powers; the protection of the confidentiality of Presidential communications has similar constitutional underpinings." *Id.* at 705–06 (footnote omitted). The Court further noted that this protection "is fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." *Id.* at 708.

This decision gives further content to the principle that the constitutional separation of powers requires the President to have effective control over the decision-making process within the executive branch. The constitutional prerogative recognized by the Court connects the President's constitutional responsibility to take care that the laws be faithfully executed with the practical need for confidentiality in executive branch deliberations. The Court has unmistakably declared

55

that the powers necessary to the implementation of the President's authority over the executive branch cannot be abridged absent a compelling and specific need asserted by another branch.[8]

### D. *Implications for the Instant Case*

The preceding discussion delineating the President's control of the unitary executive is directly applicable to the instant case. The Director of the CDC, as a subordinate executive branch officer within the Department of Health and Human Services, is subject to the complete supervision of the President with respect to the carrying out of executive functions. The congressionally-imposed requirement that the Director of the CDC develop and distribute AIDS information to the general public entails the carrying out of a purely executive function. The dissemination of AIDS information to the public does not involve the judicial function of the adjudication of cases, nor does it involve legislative activity.[9] Rather, the dissemination of this information clearly involves "[i]nterpreting a law enacted by Congress [the Continuing Resolution] to implement the legislative mandate" of furthering the public health and welfare by informing the public about AIDS, which "plainly entail[s] execution of the law in constitutional terms." *Bowsher v. Synar*, 478 U.S. 714, 732–33 (1986). In short, the President has complete constitutional authority to supervise the Director of the CDC (a subordinate executive branch officer) in connection with the dissemination of AIDS fliers to the general public (an executive function). Accordingly, by preventing the President from supervising the CDC Director in this regard, the Continuing Resolution provision at issue in this memorandum unconstitutionally infringes upon the President's exercise of that authority.

The unconstitutional nature of the AIDS-related Continuing Resolution provision also may be established by reference to the Supreme Court's discussion in *Nixon* of Congress's constitutional inability to undercut the confidential nature of internal executive branch deliberative processes. The fundamental principle emerging from *Nixon* is that Congress cannot constitutionally require the President to render unto it information bearing on the precise manner in which

---

[8] Although the *Nixon* case dealt with communications between the President and White House advisors, it seems clear that the principles enunciated therein extend at least to other important decision makers within the executive branch. *See United States v. AT&T*, 567 F.2d 121 (D.C. Cir. 1977). The *Nixon* Court specifically referred not simply to the President but to "high Government officials and those who advise and assist them." 418 U.S. at 705 Furthermore, as the Supreme Court recognized in *Barr v Matteo*, 360 U S. 564 (1959), where it extended the privilege against libel suits involving official utterances to executive officials below Cabinet rank:

> We do not think that the principle announced in *Vilas* can properly be restricted to executive officers of cabinet rank, and in fact it never has been so restricted by the lower federal courts. The privilege is not a badge or emolument of exalted office, but an expression of a policy designed to aid in the effective functioning of government The complexities and magnitude of governmental activity have become so great that there must of necessity be a delegation and redelegation of authority as to many functions, and we cannot say that these functions become less important simply because they are exercised by officers of lower rank in the executive hierarchy.

360 U.S. at 572–73 (footnote omitted).

[9] Nor can the CDC's task be viewed as quasi-legislative or quasi-judicial, as those terms are used in *Humphrey's Executor*.

the President carries out his supervisory authority. It follows, a fortiori, that the Constitution precludes the Congress from undermining the executive decision-making process by preventing the President from *even exercising* his supervisory authority over an executive agency, such as the CDC. If Congress is barred from *unacceptably interfering* in internal executive branch deliberations (*Nixon*), it surely is precluded from preventing the carrying out of such deliberations—the result that would obtain if Congress were permitted to bar presidential oversight of CDC actions.

Our conclusion that Congress cannot constitutionally preclude presidential oversight of the CDC's dissemination of AIDS mailers (or the CDC's carrying out of any other executive function) is fully in keeping with principles previously enunciated by this Office. As this Office opined in commenting upon a law that purported to require a subordinate executive officer to provide specified information directly to Congress, "[t]he separation of powers *requires* that the President have ultimate control over subordinate officials who perform purely executive functions and assist him in the performance of his constitutional responsibilities. This power includes the right to supervise and review the work of such subordinate officials, *including reports issued* either *to the public* or to Congress." *Constitutionality of Statute Requiring Executive Agency to Report Directly to Congress*, 6 Op. O.L.C. 632, 633 (1982) (emphasis added). Accordingly, a legislative provision precluding presidential review of AIDS fliers drafted by the CDC for public dissemination violates the separation of powers.

Consistent with the preceding analysis, it matters not at all that the information in the AIDS fliers may be highly scientific in nature. The President's supervisory authority encompasses *all* of the activities of his executive branch subordinates, whether those activities be technical or non-technical in nature.[10] This necessarily follows from the fact that the Constitution vests "[t]he entire executive Power," without subject matter limitation, in the President.[11]

Finally, we wish to stress the significance of the fundamental constitutional principles at stake here. The egregious manner in which the Continuing Resolution provision at issue offends the separation of powers cannot be overemphasized. Congress has no more right to prevent the President from supervising a subordinate (the CDC Director) in his performance of an executive task (the dissemination of AIDS-related information) than the President would have to preclude federal judges from reviewing draft opinions prepared by their clerks—or than the federal judiciary would have to bar Members of Congress from reviewing draft legislation and reports prepared by congressional staff. If the principle

---

[10] Thus, for example, the President enjoys supervisory authority over Environmental Protection Agency deliberations in the area of environmental science, and over National Aeronautics and Space Administration deliberations dealing with space science

[11] Indeed, it would be an absurdity to suggest that the existence of the President's supervisory authority should turn on the nature of the executive duties being exercised. In enacting laws, Congress does not categorize the many different statutory duties it creates according to their "technical" or "non-technical" nature. Moreover, there is no suggestion in the Constitution that the nature of the President's responsibility to "take Care that the Laws be faithfully executed" (U S Const art. II, § 3) is affected by the subject matter of the law under consideration

of separation of powers means anything, it means that each one of the three co-equal branches of government must be free to supervise its subordinates in the performance of their official duties. Any effort by one branch to intrude upon and, indeed, eviscerate the supervisory prerogatives of another branch is patently offensive to the separation of powers. Such a destruction of the coequality of the branches would help bring about "a gradual concentration of the several powers in the same [offending] department", thereby eliminating the means by which "[a]mbition must be made to counteract ambition." The Federalist No. 51, at 321–22 (James Madison). As such the provision at issue here is fundamentally inconsistent with our tripartite system of republican government.

## III. Conclusion

For the foregoing reasons, we conclude that Congress cannot, consistent with the Constitution, preclude the President from reviewing, either personally or through subordinates, the content of AIDS mailers that are to be distributed to the public. Statutory language that purports to preclude the President from carrying out such supervision is unconstitutional on its face and should be regarded as a nullity.

CHARLES J. COOPER
*Assistant Attorney General*
*Office of Legal Counsel*